UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

———————————————————————————X

SIMON R. LEVY,

                    Plaintiff,

          -against-

DONALD E. POWELL, Chairman,
Federal Deposit Insurance Company,

                    Defendant.

———————————————————————————X

FEUERSTEIN, J.

FILED
IN CLERKS OFFICE
U.S. ——— COURT ED N.Y.
★ AUG 2 2005 ★
P.M. _____
TIME A.M. _____

**AMENDED
MEMORANDUM & ORDER[1]
CV-00-4499(SJF)**

      Plaintiff Simon Levy (plaintiff) commenced the instant action pursuant to Title VII of the

Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, (Title VII), and the Age Discrimination in

Employment Act, 29 U.S.C. § 621, *et seq.*, (ADEA), alleging that he was discriminated against

based on race, gender, national origin, religion, and age when he was denied a civil service grade

13 (CG-13) Program Analyst position in the New York Office of the Ombudsman (OO) of the

Federal Deposit Insurance Company (FDIC), and when he was subsequently denied a civil

service grade 14 (CG-14) position in 1999. In addition, plaintiff alleged that the denial of the

CG-14 position was in retaliation for his complaints of discrimination.


A.     Background

Plaintiff is a Caucasian male presently employed by the FDIC as a Compliance Examiner,

---

[1] This amended memorandum and order is identical to the memorandum and order dated
July 7, 2005 with the exception of the italicized language on pages 7 and 24.

1

which is a civil service grade 12 (CG-12) position. Toward the end of 1998, plaintiff applied for the position of Program Analyst in the FDIC's New York OO, which was a CG-13 position. The position was given to Beverly Brookshire (Brookshire), a Native American woman, in January 1999.

In July 2004, the action proceeded to trial on plaintiff's gender and race discrimination and retaliation claims only. The jury found that plaintiff was discriminated against based on race and/or gender with respect to the denial of the CG-13 position, but that he was not discriminated against based on race, or retaliated against with respect to the denial of the CG-14 position.

Pursuant to 42 U.S.C. Section 2000e-5(k), a prevailing plaintiff is entitled to costs, and may also be awarded reasonable attorneys' fees. The parties do not dispute that plaintiff is a "prevailing party," and stipulated that I, rather than the jury, would determine the amount of damages and attorneys' fees.

A hearing was held on April 11, 2005 and June 1, 2005, at which plaintiff and Joy Crosser (Crosser), from the Human Resources Department of the FDIC, testified.

B.    The Parties' Contentions

Plaintiff contends that since "reinstatement" to a CG-13 position is not available, an award of both back pay from the date of the unlawful discrimination to the date of judgment, and of front pay from the date of judgment to retirement, is appropriate. In addition, plaintiff seeks pre-judgment interest on the back pay award. Plaintiff contends that he would have been "very well qualified" for thirty-one (31) positions in the FDIC if he had been given Brookshire's job

2

before it was eliminated on January 12, 2002. According to plaintiff[2], if he had received the CG-13 position, his pay in 2001 would have been $114,489.00 (a base pay of $94,720.00 plus locality pay). Moreover, according to plaintiff, if he had been in a CG-13 position in 2001 and 2002, when he received the reduction in force (RIF) notice eliminating that position, he (1) could have applied to any available CG-13 through civil service grade 15 (CG-15) position in the country; or (2) could have applied to any lower grade position at a salary of $94,371 and then been reinstated to a CG-13 position when one became available. Plaintiff sets forth a series of complicated calculations to arrive at an award of back pay in the amount of $142,841, an award of front pay in the amount of $163,100 for additional pay until retirement and $176,710 for additional pension until retirement, and costs (excluding attorney's fees) in the amount of $41,905, for a total award, exclusive of attorney's fees, of $524,556.

The FDIC maintains that plaintiff is only entitled to back pay, i.e. lost wages and benefits, for the period from February 28, 1999 until January 11, 2002, when the New York OO was closed and Brookshire's CG-13 position was eliminated. According to the FDIC, all RIF'd employees in the New York OO were required to seek employment elsewhere at lower grades. Brookshire had voluntarily left her employment in September 2000. The FDIC maintains that absent the unlawful discrimination, plaintiff would have received a promotion for only three years, and then been compelled to find a new position at a lower grade, as did all of the other

---

[2] Plaintiff contends that based upon his education and experience, he is qualified to calculate his own damages. (Declaration of Simon R. Levy [Levy Decl.], ¶ 4). Thus, he does not submit a separate economic report. Specifically, plaintiff avers (1) that he has been employed in the banking industry in senior positions for over 30 years, including seven years in a managerial and professional position; (2) that he has an MBA in finance, a postgraduate degree in accounting/taxation, and a masters degree in nuclear physics; and (3) that he has taken advanced courses in mathematics and statistics.

3

RIF'd employees. The FDIC maintains that front pay would, therefore, impermissibly place plaintiff in a better position than he otherwise would have been absent the discrimination. In addition, the FDIC maintains that since plaintiff only applied for two positions in 2001, he did not exercise reasonable diligence in seeking alternative employment.

The FDIC contends that plaintiff's argument that he was well-qualified for 31 positions is speculative because (1) none of the positions involved ombudsman functions; (2) he only applied for one of those positions, for which he was found qualified but not selected; (3) he only applied for a total of four positions between 2001 and 2003; and (4) his reasons for not seeking employment elsewhere were incredible because he would have been entitled to be placed at the highest salary level if selected. The FDIC maintains that the total amount of back pay to which plaintiff is entitled is $46,146, which accounts for an increase from CG-12 to the maximum CG-13 salary level of $105,647, including locality pay, and all merit increases to which plaintiff was entitled under its pay-setting policies and procedures. According to the FDIC, plaintiff's calculations are flawed because (1) he fails to account for the maximum pay ranges for his locality; (2) he calculates all raises on an "outstanding" performance level, rather than the "fully successful" rating which he actually received; and (3) he utilizes unsupported interest rates.

The FDIC agrees (1) to make all additional employer matching contributions required by plaintiff's 401-K savings plans; (2) to prejudgment interest at the rate provided by 28 U.S.C. § 1961; and (3) to calculate all pension benefits upon plaintiff's retirement upon the increased salary from 1999 through 2002.

4

C.    Discussion

1.    Back Pay

A prevailing plaintiff in a Title VII action is "generally entitled to an award of back pay consisting of the recovery of lost wages and benefits between the time of the discrimination and the entry of judgment for the plaintiff." Vernon v. Port Authority of New York and New Jersey, No. 95 Civ. 4594, 2003 WL 1563219, at * 4 (S.D.N.Y. Mar. 26, 2003).

Initially, and contrary to the FDIC's position, plaintiff mitigated his damages by continuing his employment with the FDIC in a CG-12 position after its failure to promote him in 1998. See, e.g. Vernon, 2003 WL 1563219, at * 4 (finding that plaintiff successfully mitigated his damages because he remained employed by the defendant after its failure to promote him).

However, the FDIC is correct in its contention that plaintiff's determination of back pay erroneously fails to account for its promotional and merit increase policies. See, e.g. Vernon, 2003 WL 1563219, at * 5 (finding that plaintiff's economic report was flawed because it failed to incorporate any of defendant's promotional or merit increase policies). Moreover, pursuant to 42 U.S.C. § 2000e-5(g)(1), any award of back pay must be reduced by "[i]nterim earnings or amounts earnable with reasonable diligence" by the plaintiff. In determining the amount of back pay to which plaintiff is entitled, the court must calculate the difference between plaintiff's current salary and the salary he would have earned had he been promoted.

Since plaintiff's calculation of the promotional and merit increases to which he claims entitlement does not account for the performance ratings he actually received, his analysis of the back pay to which he claims entitlement impermissibly places him in a better position than he would have been had he received the promotion to CG-13 in 1999. Accordingly, the FDIC's

5

calculation of the back pay to which plaintiff is entitled more accurately places plaintiff in the same position he would have been absent the unlawful discrimination and is, therefore, adopted.

### a.    Pre-judgment Interest

The decision to award pre-judgment interest is within the sound discretion of the district court. See, Gierlinger v. Gleason, 160 F.3d 858, 873 (2d Cir. 1998). However, pre-judgment interest is an element of complete compensation and, thus, should be awarded to make plaintiff "whole." See, e.g. Reed v. A.W. Lawrence & Co., Inc., 95 F.3d 1170, 1883 (2d Cir. 1996) (remanding the case for the calculation and award of pre-judgment interest); see also Gierlinger, 160 F.3d at 874 (holding that to the extent that damages awarded to the plaintiff represent compensation for lost wages, it is ordinarily an abuse of discretion not to include pre-judgment interest).

The appropriate rate to be applied is the federal interest rate based on the average rate of return on one-year Treasury bills for the relevant time period between the time the claim arises until the entry of judgment pursuant to 28 U.S.C. § 1961(a). See, Collins v. Suffolk County Police Dept., 349 F.Supp.2d 559, 565 (E.D.N.Y. 2004); Kuper v. Empire Blue Cross/ Blue Shield, No. 99 Civ. 1190, 2003 WL 23350111, at * 3-5 (S.D.N.Y. Dec. 18, 2003), adopted, 2004 WL 97685 (S.D.N.Y. Jan. 20, 2004).

The methodology to be used to calculate the award of pre-judgment interest is as follows:

> "First, the [backpay] award[] should be divided pro rata over the appropriate time period. * * * Second, once the award is divided, the average annual United States treasury bill rate of interest referred to in 28 U.S.C. § 1961 will be applied. * * * Third and finally, in order to guarantee complete compensation to the plaintiff, the interest will be compounded annually." (Citations omitted).

6

<u>Collins</u>, 349 F.Supp.2d at 565-566 (citing <u>Robinson v. Instructional Systems, Inc.</u>, 80 F.Supp.2d 203, 208 [S.D.N.Y. 2000], <u>aff'd</u> <u>on</u> <u>other</u> <u>grounds</u> <u>sub</u> <u>nom</u> <u>Farias v. Instructional Systems, Inc.</u>, 259 F.3d 91 [2d Cir. 2001]); <u>see</u> <u>also</u> <u>E.E.O.C. v. Walden</u>, 98 Civ. 2270, 2002 WL 31011859, at * 33 (S.D.N.Y. Sept. 9, 2002)(applying three-step process set forth in, *inter alia*, <u>Robinson</u>). *Plaintiff is directed to serve a proposed judgment using* this methodology to calculate the interest on the back pay award of $46,146.00 from February 28, 1999 to January 11, 2002 (the backpay period) and the pro rata share of this award from January 12, 2002 to the date that judgment is entered, *within twenty (20) days from the date of this amended memorandum and order. The FDIC is directed to serve any objections to the proposed judgment within ten (10) days thereafter. If the parties are unable to resolve the disputed issues, they are directed to submit to Chambers the proposed judgment, objections and all necessary documentation, including but not limited to, affidavits explaining the calculation of the proposed interest amount, within ten (10) days thereafter. Otherwise, plaintiff is directed to file the mutually agreeable proposed judgment with the clerk of the Court no later than September 6, 2005. The clerk of the Court is directed to then enter judgment accordingly.*

2.     Front Pay

The purpose of an award of both back pay and front pay damages is to restore the victim of unlawful discrimination to the position that he or she would have been in were it not for the unlawful discrimination, not to place the victim in a better position than he or she otherwise would have been. <u>Vernon</u>, 2003 WL 1563219, at * 3.

Front pay is "simply money awarded for lost compensation during the period between

7

judgment and reinstatement or in lieu of reinstatement." Pollard v. E.I. du Pont de Nemours & Co., 532 U.S. 843, 846, 121 S.Ct. 1946, 150 L.Ed.2d 62 (2001). Where reinstatement is not possible, courts may award front pay as a substitute for reinstatement. Id.; see also Banks v. Travelers Companies, 180 F.3d 358, 364 (2d Cir. 1999). Although front pay is available under Title VII, it is not mandatory and is discretionary with the court. See, Reed, 95 F.3d at 1882. "[T]he purpose of front pay is to compensate victims of discrimination who have no reasonable prospect of finding comparable employment." Hill v. Airbourne Freight Corp., Nos. 97-CV-7098, 98-CV-6249, 2003 WL 366641, at * 4 (E.D.N.Y. Feb. 20, 2003); see also Reed, 95 F.3d at 1182 (holding that front pay may be awarded where reinstatement is inappropriate and the plaintiff has been unable to find another job). The plaintiff has a duty to "exercise reasonable diligence in mitigating damages by seeking alternative employment." Reed, 95 F.3d at 1182. "Because of the potential for windfall, the use of front pay must be tempered and the court should employ the equitable principles of discretion, restraint, and balance in assessing whether to award front pay, and, if so, in what amount." Hill, 2003 WL 366641, at *4 (internal quotations and citation omitted).

Mandating a promotion of plaintiff to a CG-13 position at this juncture is not appropriate, particularly since no such position has existed in the New York OO since January 12, 2002. Plaintiff contends that he is entitled to front pay because there were thirty-one (31) positions available for CG-13 through CG-15 positions from January 2001 through January 2002, for which he would have received special selection priority had he been in a CG-13 position that was RIF'd. In addition, plaintiff maintains that there was no financial benefit for him to post for available CG-13 and CG-14 positions outside of New York, because the locality pay in other

8

areas was significantly lower than in New York. However, the foundations of plaintiff's theory are the unsupportable assumptions that (a) he was "well qualified" for the positions and (b) that he would have been successful in applying for those positions based upon his "secondary CTAP" status.

The thirty-one (31) vacancy announcements to which plaintiff refers are for positions with titles as varied as Community Affairs Specialist and Criminal Investigator and each title contains different "Selective Placement" and "Quality Ranking" factors. According to the unrefuted testimony of Crosser, each applicant was required to prepare a written statement "responding to each of the quality ranking factors" in each vacancy announcement. Candidates were divided into three "pools" and a panel of experts in the particular field of the vacancy would evaluate each candidate and rank their responses to the factors listed in the vacancy announcement.

Since Plaintiff never prepared a statement in response to any vacancy notice, much less any of the thirty-one (31) provided to the Court, his assessment of himself as "well qualified" for any of these positions is mere supposition. Indeed, as noted by Ms. Crosser, to find someone with the appropriate credentials "you would probably want to have somebody who is a subject matter expert in the area to review the description that [the applicant] provided in order to interpret what his experience equated to." (Transcript of Hearing on January 1, 2005 [Hearing Trans.], p. 36).

Assuming, however, that plaintiff had submitted response statements and was found by a panel of experts in the field to be "well qualified" for any of the vacancies, he would proceed to the "second tier" of the selection process only if there were no "reassignment eligible" applicants

9

("Pool I")-- "well qualified" applicants in the local commuting area with "primary selection priority"whose appointment would be mandatory-- and no reassignment eligible applicants from the local commuting area (Pool II) whose appointment would be discretionary.

Moreover, all of the thirty-one (31) positions cited by plaintiff are out of the New York area where Mr. Levy had strong family connections and familial obligations which created a clear disincentive to move. Considering the fact that all other members of the New York office were downgraded to, and remained at, a CG-12; the unsupported speculation that plaintiff would have been found well-qualified and selected for a position at a higher grade; and plaintiff's demonstrated and stated preference to remain in New York for the sake of his family, it appears more likely than not that, had he secured the CG-13 position in 1999, he, nevertheless, would have been in a CG-12 position following the close of the New York office. Accordingly, I decline to award any front pay to plaintiff. See, e.g. Hill, 2003 WL 366641, at * 5 (acknowledging that any award of front pay should not be unduly speculative and granting plaintiff Harrison an award of front pay in the amount of only $17,900, representing approximately one year's differential between his current and former earnings, where that plaintiff was capable of finding other meaningful employment that would more closely match what he would have been earning absent the unlawful discrimination).

### D. Attorney's Fees[3]

Thomas A. Illmensee requests attorney's fees in the amount of $300,900.00 for himself, $136,500.00 for John R. Quinn, and $17,325.00 for William S. Aramony, for a total attorney fee award of $454,725.00.

"The most useful starting point for determining the amount of a reasonable [attorney's] fee is the number of hours reasonable expended on the litigation multiplied by a reasonable hourly rate." Hensley v. Eckerhart, 461 U.S. 424, 433, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983). The resulting calculation is commonly referred to as the "lodestar" figure, and it is presumed to be a reasonable attorney's fee. Pennsylvania v. Delaware Valley Citizens' Council for Clean Air, 478 U.S. 546, 565, 106 S.Ct. 3088, 92 L.Ed.2d 439 (1986). The burden is on the fee applicant to submit evidence to support the number of hours expended and the rates claimed. Hensley, 461 U.S. at 437, 103 S.Ct. 1933.

Although the amount of attorney's fees awarded may exceed the amount of damages ultimately recovered by the plaintiff, the court must consider the amount of damages awarded in evaluating the reasonableness of a claim for attorney's fees. See, Reiter v. Metropolitan Transp. Authority of New York, No. 01 Civ. 2762, 2004 WL 2072369, at * 1 (S.D.N.Y. Sept. 10, 2004); see also Hine v. Mineta, 253 F.Supp.2d 464, 467 (E.D.N.Y. 2003)(finding that there is a strong

---

[3] Although many of the cases cited herein dealt with attorney's fees awarded in cases brought pursuant to the Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, not Title VII, attorney's fees awarded pursuant to Title VII, § 2000e-5(k), and § 1988 follow similar standards and, thus, cases decided under § 1988 "are authoritative in the Title VII context." Bridges v. Eastman Kodak Co., 102 F.3d 56, 58, n. 1 (2d Cir. 1996)(internal quotations and citations omitted); see also N.A.A.C.P. v. Town of East Haven, 259 F.3d 113, 117, n. 5 (2d Cir. 2001)(relying on precedents involving attorney's fees without regard to whether they involved Title VII or some other federal statute, since the same standards are generally applicable in all cases in which Congress has authorized an award of attorney's fees to a prevailing party).

presumption that the "lodestar" calculation represents the "reasonable" fee, even when that

calculation is disproportionate to the amount of damages awarded to the successful plaintiff; but

that the court must still determine, *inter alia*, whether the plaintiff's level of success is so low

that it should reduce the fee award).

### 1.    Hours Expended

In determining the amount of hours reasonably expended, the court must

> "examine the hours expended by counsel and the value of the work
> product of the particular expenditures to the client's case.  Efforts
> put into research, briefing and the preparation of a case can expand
> to fill the time available, and some judgment must be made in the
> awarding of fees as to diminishing returns from such further
> efforts. * * *  In making this examination, the district court does
> not play the role of an uninformed arbiter but may look to its own
> familiarity with the case and its experience generally as well as to
> the evidentiary submissions and arguments of the parties.
> (Citations omitted)."

Gierlinger, 160 F.3d at 876.

"[E]xcessive, redundant, or otherwise unnecessary" hours should be excluded from the

"lodestar" calculation.  See, Hensley, 461 U.S. at 434, 103 S.Ct. 1933; see also Rotella v. Board

of Educ. of City of New York, No. CV-01-0434, 2002 WL 59106, at * 1 (E.D.N.Y. Jan. 17,

2002)(holding that any expenditure that the court concludes was unreasonable should be

excluded from the "lodestar" calculation).  In reducing the "lodestar" amount, the court may

exclude the excessive and unreasonable hours from its calculation by making an across-the-board

reduction, or percentage cut, in the amount of hours.  See, Luciano v. Olsten Corp., 109 F.3d

111, 117 (2d Cir. 1997).

a.   Thomas A. Illmensee (Illmensee)

Initially, the time records submitted by Illmensee are accepted as proper hourly time records. See, e.g. Pinner v. Budget Mortg. Bankers, Ltd., 336 F.Supp.2d 217, 221 (E.D.N.Y. 2004)(accepting the attorney's compilation of his work rather than his contemporaneous billing records as proper hourly time records).

However, Illmensee's billing records, which indicate that he spent a total of 1,003 hours on this action, are vague. Examples include, but are not limited to, entries such as "review misc. administrative papers," "review correspondence from client," "Note to Aramony, Esq.," or "telephone conference with client."

In addition, some of the hours expended seem excessive. For example, Illmensee billed: (1) a total of 20.3 hours for the preparation of the depositions of two defense witness; (2) another 16.8 hours for the preparation of the deposition of another defense witness; (3) 23.1 hours for the preparation of the deposition of a fourth defense witness; (4) 7.8 hours for reviewing an 8 page letter to the Magistrate Judge; (5) 3.2 hours for preparing for the continued depositions of the plaintiff (when he had already billed 2.9 hours for preparation of the plaintiff's original deposition); (6) 1.2 hours for a conference before this court, for which his co-counsel only billed 0.4 hours; and (7) 2.8 hours for the "Continued completion of cross-motion [to compel discovery and for sanctions]," when he had already billed 10.1 hours on the motion. This list is not exhaustive.

Moreover, some of the entries appear redundant, insofar as, *inter alia*, Illmensee (1) billed 0.3 hours for "Review of defendant's discovery demands" on 6/6/01, and then .8 hours for "Review of defendant's discovery requests" on 7/12/01; (2) billed .1 hour for "Review proposed

13

(draft) order re: discovery received from defendant" on 9/24/01, when he had billed .1 hour on June 6, 2001 for "Review correspondence from defense counsel re: discovery schedule" and .1 hour on June 13, 2001 for "Review letter from Maggioni, Esq. Re: discovery schedule;" (3) billed .3 hours for "Review proposed protective order and send to Maggioni" on 11/6/01, and then he billed .2 hours for "Review and execute first protective order" on 11/14/01; and (4) billed 4.3 hours for "Review defendant's discovery responses sent under cover of letters 1/23 and 1/11" on 2/7/02, when he had billed 1.0 hour for "Review defendant's response to discovery request * * *" on 1/16/02, .8 hour for "Review defendant's additional responses (8 pp.) to discovery" on 1/17/02, and .8 hour for "Review defendant's answer and response to interrogatories (30 pp. and "chart")" on 1/17/02. This list is not exhaustive.

Furthermore, Illmensee bills for his travel time at his general billing rate, when he is only entitled to half of that rate for travel. See, e.g. Duke v. County of Nassau, 97-CV-1495, 2003 WL 23315463, at * 5 (E.D.N.Y. Apr. 14, 2003)(finding that it is inappropriate to compensate attorneys at their full rate for time spent traveling, and reducing the amount billed for travel time by fifty percent of the attorney's general billing rate); Connor v. Ulrich, 153 F.Supp.2d 199, 203 (E.D.N.Y. 2001).

i.      Application for Attorney's Fees and Costs

The prevailing plaintiff has a right to bill for time expended applying for attorney's fees and costs. See, Murray ex rel. Murray v. Mills, 354 F.Supp.2d 231, 241 (E.D.N.Y. 2005); Rotella, 2002 WL 59106, at * 4. Illmensee contends that he spent 41 hours compiling the motion, 28.5 hours reviewing and researching the FDIC's opposition to his motion, and 31.8

hours in compiling a response to the FDIC's opposition, for a total number of 101.3 hours on the motion. However, a complex case involving a six-day jury trial, eight depositions, and 17,000 pages of documents awarded only 30 hours for the motion for attorney's fees. See, Fink v. City of New York, 154 F.Supp.2d 403, 412 (E.D.N.Y. 2001).

In light of the vagueness, excessiveness, and redundancy of some of Illmensee's billing entries, Illmensee's hours are reduced across the board by thirty-five percent (35%). Accordingly, Illmensee is awarded attorney's fees for 651.95 hours.

### b. John R. Quinn (Quinn)

Illmensee submits the billing records of Quinn which indicate that Quinn spent a total of 455 hours on this action.

Initially, the two hours for which Quinn billed to "meet with Simon to review facts in G14 claim and statistics" on 2/26/03 clearly relate to plaintiff's unsuccessful claim and, thus, are not recoverable.

In addition, some of Quinn's billing entries are excessive. For example, Quinn (1) billed 1.5 hours to "study" a six-page case regarding front pay; (2) billed 3.5 hours to attend a conference before Magistrate Judge Levy, when Illmensee billed only 2.8 hours; (3) billed 1.0 hour to compile an e-mail to, and to read an e-mail from plaintiff; (4) billed 4.0 hours to attend a conference before Magistrate Judge Levy, for which Illmensee only billed 3.5 hours; and (5) billed 6.0 hours to attend a conference before Magistrate Judge Levy and to meet with the plaintiff and Illmensee before and after, for which Illmensee only billed 4.3 hours. Furthermore, Quinn's billing records indicate that he spent 134.0 hours on "preliminary trial preparation,"

15

"pretrial preparation," "trial preparation," and trial preparation activities such as preparing voir dire, jury instructions, trial exhibits, etc., whereas Illmensee only bills 61.7 hours for trial preparation.

Moreover, some of Quinn's billing entries appear duplicative of work performed by Illmensee. For example, Quinn billed 1.5 hours on 6/13/03 to "Work on plaintiff's letter motion re: outstanding discovery issues; draft revisions." However, Illmensee billed 7.3 hours to make the actual motion.

In light of the excessiveness of some of Quinn's entries, and since some of the work he performed appears unnecessary and duplicative of Illmensee's work and/or relate solely to plaintiff's unsuccessful claims, Quinn's hours are reduced by ten percent (10%). Accordingly, Quinn is awarded attorney's fees for 409.5 hours.

c.      William S. Aramony (Aramony)

Illmensee submits a bill and the billing records of Aramony, whom he indicates is the attorney who prosecuted plaintiff's EEO administrative proceeding. The billing records indicate that Aramony spent approximately 63 hours on the administrative proceeding and federal action.

Initially, in actions brought pursuant to Title VII, awards of attorney's fees are authorized for work done in connection with necessary administrative proceedings. See, New York Gaslight Club, Inc. v. Carey, 447 U.S. 54, 61-62, 100 S.Ct. 2024, 64 L.Ed.2d 723 (1980). Accordingly, Aramony is entitled to recover his fee for time spent on work he did on the administrative proceedings. However, since many of Aramony's entries are vague, and since some of the work performed after the federal action was commenced appears duplicative of Illmensee's work or

16

unnecessary, Aramony's billing records are reduced by ten percent (10%). Therefore, Aramony is awarded fees on 56.7 hours.

### 2. Hourly Rate

In determining a reasonable hourly rate, the court should consider the prevailing rates of lawyers with comparable skill, experience and reputation in the district in which the action was commenced and litigated. Missouri v. Jenkins by Agyei, 491 U.S. 274, 286, 109 S.Ct. 2463, 105 L.Ed.2d 229 (1989); Luciano, 109 F.3d at 115. "Where litigation spans a number of years, the reasonable hourly rate should be adjusted to account for the delay factor, either by basing the award on current rates or by adjusting the fee based on historical rates to reflect its present value." Reiter, 2004 WL 2072369, at * 4 (internal quotations and citation omitted). In addition, an attorney's customary rate is a significant factor in determining a reasonable rate. Id., at * 5. "Indeed, as a logical matter, the amount actually paid to counsel by paying clients is compelling evidence of a reasonable market rate." Id. Moreover, the size of the firm is a factor in determining the reasonableness of an attorney's fees, since a smaller firm does not have the same overhead costs as a larger firm and, thus, should have a lower rate. See, Murray, 354 F.Supp.2d at 236; Reiter, 2004 WL 2072369, at * 7.

In 1998, the Second Circuit held that reasonable rates for legal services in the Eastern District were $200.00 for partners, $135.00 for associates, and $50.00 for paralegals. Savino v. Computer Credit, Inc., 164 F.3d 81, 87 (2d Cir. 1998). In 2003 and 2004, district courts in the Eastern District found rates of between $225.00 to $300.00 for partners to be reasonable. See, Pinner, 336 F.Supp.2d at 220 (fixing attorney's fee at $250.00 per hour to account for, *inter alia*,

the probable increase in fees since 1998); Separ v. Nassau County Dept. of Social Servs., 327

F.Supp.2d 187, 191 (E.D.N.Y. 2004)(fixing attorney's fees at $250.00); Hine, 253 F.Supp.2d at

466 (finding the requested rate of $225.00 per hour to be in line with the market rates in the

Eastern District of New York); Duke, 2003 WL 23315463, at * 2 (finding the requested rate of

$300.00 to be reasonable for an accomplished trial attorney specializing in the practice of civil

rights law).

Further, clerical work, such as filing a complaint, is only compensable at a reduced rate of

$50.00 per hour. See, e.g. Reiter, 2004 WL 2072369, at * 8.

Initially, it should be noted that this Title VII employment discrimination case involved

no complex issues of law or fact.


a.    Illmensee and Quinn

Illmensee claims that he and Quinn are entitled to hourly rates of $300.00. In support of

his claimed rate, Illmensee avers (1) that he has been practicing for almost thirty-five years; (2)

that he has been in private practice for over twenty-five years; and (3) that he has previously

litigated a number of employment discrimination cases, of which he identified two. (Declaration

of Thomas A. Illmensee [Illmensee Decl.], ¶ 2). Illmensee does not indicate what his customary

rate is or whether he is a solo practitioner, although his address and contact information suggest

that he is.

Illmensee also avers that Quinn is entitled to a rate of $300.00 because (1) he was a

former law clerk for a district judge in this district; (2) he has two degrees from Harvard

University; and (3) he has previously litigated several employment cases in this circuit.

(Illmensee Decl., ¶ 3)[4]. Illmensee does not indicate what Quinn's customary rate is or whether he is a solo practitioner or the member of a law firm. Quinn's contact information suggests that he is affiliated with the law firm of Joseph W. Ryan, Jr., P.C., although it cannot be ascertained whether he is a partner or associate with that firm or whether that is a small, medium-sized, or large law firm.

Neither Illmensee nor Quinn has submitted any evidence that they have expertise in civil rights law. See, e.g. Duke, 2003 WL 23315463, at * 2. Neither provided evidence of their customary rate or a retainer agreement indicating a rate of hourly remuneration. Illmensee has not identified any other case in this district which awarded a rate of $300.00 to an attorney of his skill, experience, and expertise. Therefore, I find $250.00 to be a reasonable hourly rate for Illmensee and Quinn. Accordingly, the "lodestar" amount (1) for Illmensee is $162,987.50 (651.95 hours times $250.00); and (2) for Quinn is $102,375.00 (409.5 hours times $250.00).

### b.   Aramony

Illmensee contends that Aramony is entitled to an hourly rate of $275.00, which he contends is the actual rate charged by Aramony to plaintiff and is actually a discounted rate from Aramony's customary rate of $300.00 per hour. (Illmensee Decl., p. 3, fn.). Illmensee does not indicate whether Aramony is a solo practitioner or the member of a law firm, although the letterhead on his invoice indicates that he may be a solo practitioner.

Although Aramony's invoice indicates that his customary rate is $300.00, and that he

---

[4] Quinn has not submitted his own declaration in support of his request for attorney's fees due to personal reasons.

19

actually billed plaintiff $275.00, his office is located in Virginia. Therefore, his actual rates do not necessarily reflect the prevailing rate in this district and, thus, are not probative on the issue of what is a reasonable fee for his legal services. Since Illmensee impliedly admits that Aramony is not entitled to the same fee as he and Quinn, and since plaintiff has not submitted any evidence regarding Aramony's skill, experience and expertise, or lack thereof, in federal civil rights litigation, I find that a reasonable rate for Aramony's legal service is $225.00. Accordingly, the lodestar calculation for Aramony's fees is $12,757.50 (56.7 hours times $225.00).

### 3. Adjustment

After the initial "lodestar" calculation is made, the court may adjust the amount upward or downward depending upon, *inter alia*, the plaintiff's level of success. Hensley, 461 U.S. at 434, 103 S.Ct. 1933. Where a prevailing plaintiff is only partially successful, the court must consider (1) whether the unsuccessful claims were unrelated to the successful claims; and (2) whether "the plaintiff achieve[d] a level of success that makes the hours reasonably expended a satisfactory basis for making a fee award." Id.

In cases in which a plaintiff has obtained "excellent results," his or her attorney should recover the full "lodestar" amount notwithstanding that the plaintiff may have failed to prevail on every contention raised in the lawsuit, and in rare cases of "exceptional success", an enhanced award may even be justified. Hensley, 461 U.S. at 435, 103 S.Ct. 1933; see also Delaware Valley Citizen's Council for Clean Air, 478 U.S. at 566, 106 S.Ct. 3088. In cases in which the plaintiff has achieved only a partial or limited success, the full "lodestar" amount may be excessive, even if the unsuccessful claims were interrelated to the successful claims, and were

20

nonfrivolous and raised in good faith. Hensley, 461 U.S. at 436, 103 S.Ct. 1933. "[T]he extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees * * *." Id. at 440, 103 S.Ct. 1933; see also N.A.A.C.P., 259 F.3d 113 (finding that the most critical factor in determining the reasonableness of a fee award is the degree of success obtained. [internal quotations and citation omitted]).

In determining the compensation to be awarded to a prevailing plaintiff where there has been only a partial success, the court "may attempt to identify specific hours that should be eliminated or it may simply reduce the award to account for the limited success." Hensley, 461 U.S. at 436-437, 103 S.Ct. 1933; see also Separ, 327 F.Supp.2d at 190-191 (holding that when determining the proper reduction, the court can attempt to identify and subtract those hours spent litigating the unsuccessful claims, or it can simply reduce the award to account for the limited success). The district court should provide "a concise but clear explanation of its reasons for the fee award," and when an adjustment is made to the "lodestar" amount, the court "should make it clear that it has considered the relationship between the amount of the fee awarded and the results obtained." Hensley, 461 U.S. at 437, 103 S.Ct. 1933. The party requesting the adjustment has the burden of establishing the propriety of a departure from the "lodestar" amount. Reiter, 2004 WL 2072369, at * 9.

The FDIC contends that it is entitled to a further reduction of the "lodestar" amount by 25% because of plaintiff's "limited" success on only one of the three claims which went to trial.

Initially, the total "lodestar" amount is reduced by five percent (5%) for the claims withdrawn by plaintiff prior to trial, including his disparate impact claim and his claims of discrimination based on age, religion and national origin. See, e.g. Pinner, 336 F.Supp.2d at 222

21

(reducing the "lodestar" amount by five percent for the two withdrawn causes of action); Separ, 327 F.Supp.2d at 191 (holding that although claims that are raised in good faith and later abandoned are not sufficient grounds, standing alone, for reducing an award of attorney's fees, where a plaintiff pleads and then later fails to submit any material evidence on a claim, it is appropriate to reduce the fee based upon the pursuit of "inflated" claims). Significantly, much of the time spent by plaintiff's attorneys, and particularly Quinn, retaining experts and obtaining expert opinions relates to the disparate impact claim which was ultimately withdrawn.

In addition, the "lodestar" amount is further reduced to account for plaintiff's limited success at trial. See, e.g. Separ, 327 F.Supp.2d at 190 (holding that where a plaintiff fails to succeed on a number of claims, a reduction of fees is usually warranted). Specifically, since the jury found against the plaintiff on two of the three causes of action which proceeded to trial, a downward departure from the "lodestar" amount is justified. See, e.g. Separ, 327 F.Supp.2d at 192 (reducing attorney's fees by sixty percent [60%] where plaintiff originally pled several causes of action but failed to submit any material evidence in support of them resulting in dismissal of those claims at the close of plaintiff's case); Hine, 253 F.Supp.2d at 467 (finding that a substantial downward departure from the lodestar amount was justified where the jury found against the plaintiff on two of the three causes of action that proceeded to trial and all of the damages claims except lost benefits, and reducing the amount of attorney's fees by sixty percent [60%] accordingly). Since the FDIC is requesting only a twenty-five percent (25%) reduction in the "lodestar" amount based upon plaintiff's limited success, I find that this is the appropriate percentage adjustment[5]. Therefore, the total amount of attorney's fees awarded to

---

[5] This percentage includes the five percent (5%) for the withdrawn claims.

plaintiff is $208,590.00[6].

E.    Costs

Prevailing plaintiffs are entitled to recover reasonable, identifiable out-of-pocket

disbursements which are ordinarily charged to clients. See, U.S. Football League v. National

Football League, 887 F.2d 408, 416 (2d Cir. 1989).

Plaintiff requests recovery of disbursements for photocopies, deposition transcripts,

expert witness fees, travel, filing fees, messenger services, mailings, and facsimiles, all of which

are recoverable. See, e.g. Hine, 253 F.Supp.2d at 467 (awarding costs for deposition transcripts,

transcripts of the court proceedings, and expert witness fees); Rotella, 2002 WL 59106, at * 5

(finding that photocopying, travel, incidental travel expenses, telephone costs, and filing fees are

generally recoverable). Although plaintiff contends that the amount of disbursements totals

$41,905.00, he submits documentation which totals only $38,675.61[7]. Accordingly, plaintiff is

awarded costs in the sum of $38,675.61.

F.    CONCLUSION

Based on the foregoing, it is hereby

ORDERED, that the plaintiff is awarded back pay in the amount of $46,146 for the period

---

[6] ($162,987.50 + $102,375.00 + $12,757.50) times .75.

[7] Plaintiff has submitted FedEx receipts which do not contain an amount. I ascertained
the rates from the FedEx website. However, where plaintiff did not specify the service requested
on the receipt, such as "standard overnight" or "priority overnight," I used the lowest rate, since it
is plaintiff's burden to document his expenses.

February 28, 1999 through January 11, 2002; and it is further

ORDERED, that *plaintiff is directed to serve and file a proposed judgment in accordance with this order and* using the methodology set forth in section C(1)(a) above on the back pay award of $46,146 from February 28, 1999 to January 11, 2002 and the pro rata share of this award from January 12, 2002 to the date that judgment is entered; and it is further

ORDERED, that the FDIC will make all additional appropriate employer matching contributions required by plaintiff's 401-k savings plan; and it is further

ORDERED, that the FDIC will calculate plaintiff's pension benefits upon retirement in accordance with its "high three" average salary policy, taking into account, as necessary, the increase in his salary for the years 1999 through 2002; and it is further

ORDERED, that plaintiff is awarded attorney's fees in the sum of $208,590.00, and costs in the sum of $38,675.61, for the total sum of $247,265.61; and it is further

ORDERED, that the clerk of the Court is directed to enter judgment *on the proposed judgment filed by plaintiff in accordance with this order*; and it is further

ORDERED, that *upon the filing of the proposed judgment and the entry of judgment thereon,* the clerk of the Court is directed to close this case.


SO ORDERED.

_____
SANDRA J. FEUERSTEIN
United States District Judge

Dated: July 28, 2005
      Central Islip, New York

Copies to:

Thomas A. Illmensee, Esq.
1050 Franklin Avenue, Ste. 500
Garden City, New York 11530

Law Office of Joseph Ryan, P.C.
190 EAB Plaza, 15th Floor
Uniondale, New York 11556

William S. Jones, Esq.
Federal Deposit Insurance Corporation
801 17th Street NW
Washington, DC 20429

Paul D. Maggioni, Jr., Esq.
FDIC, Legal Services Office
20 Exchange Place, 6th Floor
New York, New York 10005